The last argument we have for argument today is United States v. Tillman, docket 25-8014. Counsel? Good morning. May it please the Court, I'm John Grivellius on behalf of Conrad Tillman. I will intend to try to carve out rebuttal time this morning and I'll keep track of my time, of course. I want to start this morning, Your Honors, with the second issue in the briefs concerning the District Court's failure to provide a rationale and methodology for calculating the five-level increase. I start there because the government has conceded error and that it was obvious. So the only question on the second issue is that of prejudice. And this error prejudiced my client. The District Court raised the top of his guideline range from 17 and a half years to just over 30 years and this almost doubled his sentencing exposure under the guidelines. Now, such a substantial guidelines jump requires a substantial justification and explanation. Can I interrupt you and just ask a practical question which will be nagging at me for the whole rest of your time if I don't ask it now? So as I understand it, his release from custody, he's on supervised release now, is that correct? I don't believe that's correct. Okay. All right. I'll take your word for it. That was my mistake then. And Your Honor, I can't speak with any confidence on that, but I do know that my client did receive a 30-year sentence. So I mean, I can double-check, but assuming that my client is still serving his time, I will point out that, as I said, that we have to require substantial explanation for such a guidelines jump. And as the government admits, we don't have an explanation of the methodology used. But according to the government, this issue, this error is harmless because it believes that the court imposed a variance or would have imposed a variance to achieve a 30-year sentence. But as this Court has said time and time again, a district court cannot insulate guidelines error by simply saying that it would impose the same sentence under the 3553A factors. Can we just take the departure stuff out of the equation and evaluate this case purely under 3553A, or do they not separate? Well, no, we couldn't, Your Honor, for two reasons. One, because the court didn't impose a 3553A sentence, which I can get to in a moment. But also, we have to accept the departure, and we have to face that because that's what the court did. And we cannot effectively re-sentence my client or sentence him for the first time on appeal. So I certainly disagree with the government's— Well, let me just pause you there because I'm looking at the record, Judge Rankin's comments, and he says, I will also take into consideration the 3553A factors as a variance for the same reasons as articulated a moment ago. So how do you say he didn't address 3553A? My contention isn't that he didn't address 3553A. My contention is that he cannot insulate a guidelines error by saying that he would impose a sentence under 3553A factors. And this remains true even if, for example, he does make findings under the 3553A factors and even gives them weight. We see that from the Burris case, the Peña-Hermosillo case, and the Geiswein cases, all of which I cite in my briefs, which stand for the proposition that a guidelines error cannot be insulated simply because the court says on the record, and even maybe makes findings to the effect that it would impose the same sentence. And this court holds firm to that rule for good reason because, as we know, the correct guidelines calculation has to serve as the anchor for every sentence. Well, I understand that in the context of a court, and we've seen a lot of cases like that over the years, where the court says, you get plus four for leadership or something. And even if I'm wrong about that, why, if this comes back, I'm going to impose the exact same sentence. And we say, no deal on that. It's coming back and you're going to have to find it. But this one seems different to me in that the court goes through the reasons for its sentence, the reason it thought that this deserved a bigger penalty than the advisory guideline range, and then says, there's a separate basis I'm relying on. That's the 3553A factors. And the same amount, I would go up for the same reasons. In other words, we're not left groping for what would the district court do or why would it do it. It's told us that, has it not? Well, no, Your Honor, I would dispute that for one, well, a couple of reasons. First of all, the court clearly wanted to impose a sentence under the umbrella of the guidelines, which is precisely why its focus throughout sentencing its order was on Chapter 5 guideline provisions for upward departures. That was where most of the focus was below, both in the arguments of counsel and the  court clearly wanted to impose a sentence within the umbrella of the guidelines. And it did not vary because the statement of the reason says it only imposed an upward departure. And as we know, 3553C requires the court to indicate the basis for its what we'll call non-guideline sentence. And certainly here, it did not indicate anywhere that it was imposing a variance. So it did not impose a variance. And I think also, back to my earlier point, Your Honor, this does not get the exception that we see in cases like Gaiswine, Burris, and Pena-Ramosillo, because again, we can have a court say these things, but it still has to correctly calculate the guidelines range. The guidelines themselves are part of the 3553A factors. So it is an important step, and we can't just have an insulated error based on that statement alone. Now, I want to also point out, Your Honors, because I would be remiss if I didn't address this, the government's argument is also that, well, okay, on remand, all we're going to have to do is send it back to have the court simply explain its five level increase. And I do not believe, and I certainly contest, that this idea that there's a five level increase is foreordained or inevitable. I say that for two reasons. First of all, based on the rule, the court has to provide a methodology that is tied to the guidelines themselves, and that's either by extrapolation or analogy. And to do this, they have to effectively predict what the sentencing commission would have set forth as the appropriate range for that conduct. Now, in the record, we have nothing that suggests that the district court even used a methodology. The government provided no methodology that would have allowed the court to use the guidelines to calculate a five level increase. The government never said anything in its briefing below, and on appeal, tellingly, it offers nothing in the record that points to any indication that the court used a methodology. And certainly, probation, for its part, recommended a one level upward departure. It didn't provide a methodology to hit the five levels. And so, I want to give a second reason for this, Your Honor, is I don't see anything in the guidelines themselves, either by analogy or extrapolation, that would automatically lead to a five level increase in this case. Consider a slightly different case where my client is also charged with and convicted of threatening M1 with a firearm, directly threatening the firearm, such that he is guilty of aggravated assault or assault. Either way. Now, under the guidelines, the way that would work, it wouldn't be grouped, but it would potentially add units to his offense if we treated that as a separate offense, but that in and of itself, if you look, I think it's chapter three, section D, if we actually did the math there, you would not get a five level increase, even if my client had committed a separate offense of threatening M1 directly with a firearm. Now, I don't say that to say that there would be no increase. All I am saying is that the five level increase, it's supposedly tied to the guidelines, is anything but obvious to me. And so, your honors, I do think that the-  Yes. I just didn't want you to run out of time before you deal with the first issue. Okay. I was going to pivot to that. Okay, thank you. Okay, well, the first issue is a straightforward case of guidelines error. 5K2.6 should just not have applied here. In Kelly, this court said that 5K2.6 does not apply in murder cases, because committing a murder necessarily requires use of a dangerous instrumentality, and the sentencing commission was aware of this fact and took that into account when setting the guidelines range for murder. Under Kelly, then, it seems that if there's any case in which you can apply this to a murder case, and it quotes 5K2.0 at the time it existed, it would have to be that the use of a weapon was, to a degree, substantially in excess of that which is normally involved in a murder. And there were no findings below here that that is what happened. There was no finding, for instance, that my client's use of the firearm endangered anyone else, including M1, let alone that it substantially threatened her more than what occurs in other murders where, of course, murder is dangerous. Sorry. Is it a fair inference from the court's statements about that it was fired in an enclosed automobile when she was present? Is it a fair inference that it endangered her substantially? No, Your Honor, I don't think that that's the fair inference. I say that because below it was the government's position that this endangered M1, and that is why 5K2.6 applied. It actually argued that and the alternative theory that the court ultimately adopted, which is trauma to M1, it argued both. But the court conspicuously only accepted the trauma aspect, and it never found specifically that she was endangered. And we would certainly need that finding because that's a finding of fact that we cannot make here on appeal. Didn't the court recognize or say that perhaps in this sort of a situation, once you put things into this kind of motion, maybe the young girl would try to intercede on behalf of her mother and become injured in that fashion? Well, the court never made that finding, Your Honor. That was the government's position that perhaps she could have intervened or crossed the line of fire. The government did couch its language in terms of what could have happened, but there was no finding whatsoever that that was the basis. It was clear that the court imposed this departure for the reason that, A, that the firearm was discharged. It said that twice, and that it was fired in an enclosed vehicle in her presence without justification. So none of this is really addressing... But is it your position that it's ambiguous whether the court decided it based on trauma to the minor or substantial danger to the minor? I don't think it's ambiguous in the sense that I don't... It's clear the court did not adopt the endangerment theory. Now, whether it was adopting trauma, I think that's a little closer of a question. If you read the whole sentencing transcript in context, it kind of refers back to its original discussion about why it was departing under 5K 2.0, which really kind of encompassed trauma to M1. But I think, yeah, perhaps it is ambiguous what exactly, whether between firing the pistol or trauma to M1 or just the circumstances, but it never found that she was endangered and that that was the basis for applying that departure. And, Your Honors, just briefly, I want to touch on this. As I've argued in the briefs, trauma can't be the basis for 5K 2.6 to apply. That's covered by other departure provisions. And I'm certainly not telling this court that her trauma doesn't count. Indeed, I'm just saying that it doesn't count twice because the court did use that under 5K 2.0, and we have not challenged that on appeal. And, Your Honors, unless there's other questions, I would like to reserve the balance of my time. Very well. Thank you. Thank you. Good morning, Your Honors. My name is Cameron Cook, and I represent the government in this case. I'm here to answer any questions and explain why the district court got this case right. The first issue I want to address is- I want to stay where we were on the trauma versus danger issue. If we look at our case in the United States versus Edmonton, we made it pretty clear that it's not our goal to make factual findings necessary to support the imposition of a sentencing enhancement. And here, I mean, I don't think the court made a specific finding that it was applying 5K 2.6 because of substantial danger to the minor. And it talks about trauma quite a bit. Do we need to send it back to have the courts make a finding and tell us what the basis of this was? No, Your Honor. The finding was that 5K 2.6 applied. So I will agree that the district court didn't go into details on- because if you read 5K 2.6, it says possession or use of a dangerous weapon, and then it says the extent of the increase may depend upon the dangerousness, the manner of use, and the extent to which it endangered others, and then finally says discharge, the firearm may warrant substantial increase. So the district court didn't explicitly say where in there it was basing its reasoning mostly, but it did find that it applied. And its reasoning that the firearm was used in a confined space in the presence of M1, I think it's fair to read that reasoning as endangerment, as the manner of using it in front of M1, and all these knock-on effects of the trauma that she would experience later on. So I do think there was a sufficient finding under 5K 2.6 here. But there's no specific finding that says he endangered, substantially endangered. That's correct, Your Honor, and that is not in 5K 2.6. So I don't think it's necessary. But yes, the district court did not make that specific- It's not in 5K 2.6. I mean, 5K 2.6 says when it's appropriate to impose it. And as you indicated, it has, as one of the factors, endangerment of others, discharge of the gun. But the court didn't tell us why it decided to impose 5K 2.6. And I guess your position is you can infer it? Your Honor, yes, reading it fairly, the district court did say, because it used it, again, the manner, using it in front of M1, without justification, in the confined space of the pickup. This was a very narrow compartment in which it was fired. The evidence of the sentencing hearing from the defendant himself was that the victim was on her hands and knees attacking him while he was still driving the vehicle at night on a highway, and that basically she hit his arm and the gun went off. And so, when you add that context of the record to what the district court did say, I do think that's sufficient under 5K 2.6. Wasn't that having us make the finding, looking at the evidence, and making a finding? I disagree, Your Honor. I think the district court did make the finding on 5K 2.6. I think they could have been a little more explicit, but it addressed the manner of use. And again, confined space, the fact that she was there, that's inherent in describing the circumstances of when the shooting, how the shooting occurred. It's also inherent in her being traumatized, right? Yes, Your Honor. That's the easy and obvious knock-on effect of using the firearm in front of her. So, I mean, I guess the argument is that we won't know whether the court was using those facts to support a finding of trauma or a finding of dangerousness. Well, again, Your Honor, I disagree. The provision says manner of use and the extent to which it endangered others. Again, the district court said, use it in confined space in her presence. I think that's sufficient for what the departure says. Your Honor, we're really drawing the line there on, I understand the ruling of Kelly, but I just point out the district court and Kelly dealt really with a record that had just the bare use of a dangerous weapon in private. Here, we're drawing the distinction based on the use of the dangerous weapon in relation to a third party, which is not inherent in murder as charged. So, there's nothing inherent in there and for the reasons you put forth in the brief, it does elevate this away from the heartland. So, we think it was proper here. Unless there are any more questions about Kelly, I would like to turn to prejudice. Judge Phillips touched on it, but this is the key fact, key factor for understanding why there is no prejudice in this case. There was no error in the jumping off point for the variance. Judge Phillips talked about there are some cases where the district court erroneously applies a two-level, four-level enhancement, reaches an improperly high guideline range, and then varies off that point up above. Here, the initial calculation was an offense level of 35, that's second-degree murder, 38 minus three for acceptance. And then the district court departed upward five levels, but also varied upwards five levels to reach the same conclusion. So, yes, the departure was erroneous because the district court did not explain why he departed. The variance was not affected by that error. It was independent and not tainted. And as we argue, the district court's variance was thorough, cogent, and supported by an exhaustive record. The defense in their brief repeatedly calls the district court's variance perfunctory. That is simply not accurate. It's worth stating on the record that the district court started his imposition of sentence by acknowledging the defendant's apology, both at sentencing and after the crime had occurred. The district court described the circumstances of the offense. He described evidence of the defendant's past abusive behavior, which was testified about at the hearing. It commented probably the most significant factor other than UT losing her young wife at age 36 was the presence of M1 in the backseat. The district court questioned what things would look like for her in the future. The district court acknowledged and considered the defendant's statements, the defense investigation, and the victim impact statements. It addressed the departures. And then it made specific references to the section 3553A factors, including the nature and circumstances of the offense, which it had already discussed, but also commented on bruises to UT's face and lips, preceding the firing of the gun, the physical harm and name calling to M1, the use of a firearm. The district court called this crime senseless, unnecessary, and cruel, and that it resulted in tremendous loss to the entire family, but particularly to her children. The district court commented on the history and characteristics of the defendant. He referenced his power and control and anger that culminated in UT's death, commenting this is seen in his relationship with Bear Comes Out, who testified at the hearing and UT over the years. The district court acknowledged the lack of accountable criminal history, and that he's done good in the community, but here he did more bad than good. He commented that he'd already discussed the seriousness of the offense. The need to promote respect for law and provide just punishment would be shown by the ultimate sentence imposed. The district court emphasized the murder was completely senseless and driven by some sort of percolating anger that was taking place on the day by the defendant. And then the district court commented on the need for deterrence and protection of the public, stating without addressing these anger, power, and control issues, the defendant is a danger to society. He commented that the defendant committed this murder in front of his daughter with very little provocation. After all that, the district court departed upwards, and then also the language that Judge Phillips referenced earlier took into consideration the 3553A factors, Teresa Variance, which was reasonable and appropriate under the facts of the case. And, Your Honor, all that was supported by an exhaustive record. Not gonna go over it all, but we had the case agent testify about evidence. We had Keishon Bear comes out, testify about the defendant's past abusive behavior, both to him and also UT. And then there was an expert who testified about the gunshot and had his report entered in evidence, basically that UT was looking away and down when she was shot in a defensive position. And then the defense also put on evidence, and the defendant himself testified, gave his version of events, which is a little unusual. They also had an investigator testify and provide a number of exhibits that they thought was mitigating. So this all provides context to the district court's analysis of the factors, and it shows that this was a thorough and cogent variance, unaffected by the error. Can I ask a question about that? So you started this part of your argument by saying that there was no error in the jumping off point for the 3553 analysis. Yes. Which I take it to mean you're saying there was no error in the guideline calculation, which prompted that analysis. Is that your position? Yes, Your Honor. The initial calculation of 35. 35 was the initial offense level calculated, and from there, defense requested basically a low-end guideline sentence, and the government and the district court went with an upward departure and an upward variance. But so you're saying that a jumping off point was before the departures were applied. There was no error in that. Yes, Your Honor. Okay, but so that's not inconsistent with your concession that the district court failed to adequately explain its degree of departure. Yes, Your Honor, because the departure comes afterwards, and we admit that was error not explaining it, but we have this separate variance, which was thorough and cogent, and was unaffected by the departure error, is our argument. Did the government go through the 3553A factors in particular? It did, Your Honor, both in submitting, definitely in the briefs that were submitted in the sentencing memorandum that was submitted before the sentencing hearing, the government addressed those factors, that'll be in the record. I don't think, I'm unsure if I specifically addressed each of those at the sentencing hearings, but there was an argument made, and I did reference the sentencing memorandum, which definitely did address those factors. Your Honor, lastly, I would just note, this case is lacking a lot of the, excuse me, lacking a lot of the other errors we see in other cases. There is no factual error committed by the district court, such as in the Guevara-Lopez case. There's been no showing that this is an unwarranted disparity for murder cases, also in Guevara-Lopez. As argued, this wasn't a perfunctory statement that, oh, I just would've imposed the same sentence anyway. The district court didn't focus exclusively on one factor, like in the Crosby case. Here, the district court talked about mitigating and aggregating evidence in multiple 3553A factors. And then, as argued, that guideline range error wasn't, the starting point wasn't affected by that, that was just a departure. So, Your Honor, looking at the record in this case, whichever standard review we use, either preserved or plain error, it's clear that the sentence the district court would impose would be the same without the error. So, unless there are any further questions, I would ask the court to affirm. Thank you, counsel. Thank you, Your Honors. I'm gonna start with prejudice. The question here isn't whether the district court made findings that were relevant to the 3553A factors. The government's argument that this can be affirmed because the court made what it calls extensive findings on the 3553A factors doesn't get off the ground under this court's decisions in Burris, Piñera-Murcio, and Geiswein. In fact, the only case that even supports the idea that this type of, well, I would impose a 3553A sentence regardless, actually came in Geiswein, but that was only because the district court had previously sentenced the defendant to that, to what was the stat max in that time. The court had said it intended to impose a statutory maximum, and it had said clearly, or it made clear that it intended to impose a sentence outside of the guidelines themselves. We do not have that here. The court was clearly intent on imposing a guideline sentence, which is why it spent a lot of time, a substantial amount of time, trying to justify the sentence under chapter five in the guidelines. And so I do not see how the government's argument gets off the ground under this court's precedent. Well, the court addressed the party's contentions. It's not like the court was just sitting there by itself and came up with these departures. Proposed to the court, so the court addressed them. Well, I mean, that may be true, Your Honor, but we are stuck with what the court said, and the court did impose departures under chapter five. Now, I don't- Excuse me, did the government offer any methodology for explaining the degree of the departures? None whatsoever, Your Honor. And I would be remiss if I didn't talk about, just briefly, although it's again my position that this isn't dispositive, but the district court did not make the exhaustive findings on the 3553A factors that the government contends. It didn't discuss general deterrence, which in Crosby, this court said, is one of the key components of sentencing. And it didn't talk about sentencing disparities whatsoever. And it didn't provide any explanation to how it was weighing these and why the weight of these factors justified such a large jump in sentence. So, Your Honor, I do not see how this can be harmless under this court's case law or under the facts of this case. And I see I'm basically out of time, and I therefore ask that you all reverse. Thank you. Thank you, counsel, for your helpful arguments. The case is submitted. Counsel are excused. The court stands in recess until 8.30 tomorrow morning. Thank you.